# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHANEL WILEY,

*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA DISTRICT COURT NO. CR 20-298-JAK*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

ELIA HERRERA
DAVID Y. PI
Assistant United States Attorneys

1400 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-2024
Email: elia.herrera@usdoj.gov
        david.pi@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**            **PAGE**

I.    INTRODUCTION ........................................................................ 1

II.   ISSUES PRESENTED ................................................................ 3

III.   STATEMENT OF THE CASE ................................................. 3

     A.    Jurisdiction, Timeliness, and Bail Status ............................. 3

     B.    Statement of Facts and Procedural History ......................... 4

         1.    An informant buys methamphetamine from defendant and Penner ...................................................... 4

         2.    Defendant's ankle monitor beeps during jury selection .................................................................... 9

         3.    Trial, conviction, and sentencing ................................ 12

IV.   SUMMARY OF ARGUMENT .................................................. 12

V.    ARGUMENT ............................................................................ 14

     A.    The Evidence At Trial Was Not Plainly Insufficient ........... 14

         1.    Standard of review ...................................................... 14

         2.    A rational juror could find that defendant was a participant in the conspiracy and was not merely associating with Penner .............................. 17

     B.    The District Court Did Not Plainly Err or Abuse Its Discretion In Addressing The Issue of Defendant's Electronic Monitoring Device Beeping During Jury Selection ............................................................................ 24

         1.    Standard of review ...................................................... 24

**TABLE OF CONTENTS (continued)**

DESCRIPTION                                                    PAGE

2. Legal framework ...........................................................25

3. The district court acted within its discretion ..............28

4. Defendant has not shown prejudice.............................30

5. There was no constitutional violation..........................33

VI. CONCLUSION ..................................................................36

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                    **PAGE(S)**

## Federal Cases

*Bernal v. Woodford,*
　281 F. App'x 706 (9th Cir. 2008) ....................................26, 28

*Cox v. Ayers,*
　613 F.3d 883 (9th Cir. 2010) ...............................................34

*Deck v. Missouri,*
　544 U.S. 622 (2005) .........................................25, 26, 27, 28

*Higgins v. Addison,*
　395 F. App'x 516 (10th Cir. 2010) ......................................27

*Holbrook v. Flynn,*
　475 U.S. 560 (1986) ........................................25, 27, 32, 33

*Jackson v. Virginia,*
　443 U.S. 307 (1979) ...............................................14, 15, 22

*Larson v. Palmateer,*
　515 F.3d 1057 (9th Cir. 2008) ...........................................32

*Nance v. Warden, Georgia Diagnostic Prison,*
　922 F.3d 1298 (11th Cir. 2019) ....................................26, 28

*Puckett v. United States,*
　556 U.S. 129 (2009) ...........................................................17

*White v. United States,*
　2023 WL 2668431 (E.D. Mich. 2023) ...........................27, 28

*United States v. Alarcon-Simi,*
　300 F.3d 1172 (9th Cir. 2002) ...........................................15

*United States v. Begay,*
　673 F.3d 1038 (9th Cir. 2011) ...........................................16

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                     **PAGE(S)**

*United States v. Benamor,*
937 F.3d 1182 (9th Cir. 2019) .................................. 16

*United States v. Bennett,*
621 F.3d 1131 (9th Cir. 2010) .................................. 16

*United States v. Busch,*
411 F. App'x 872 (6th Cir. 2011) ......................... 26, 28

*United States v. Christensen,*
828 F.3d 763 (9th Cir. 2015) .................................. 28

*United States v. Cruz,*
554 F.3d 840 (9th Cir. 2009) .................................. 17

*United States v. Del Toro-Barboza,*
673 F.3d 1136 (9th Cir. 2012) .................................. 16

*United States v. Duenas,*
691 F.3d 1070 (9th Cir. 2012) .................................. 18

*United States v. Garcia-Guizar,*
160 F.3d 511 (9th Cir. 1998) .............................. 17, 23

*United States v. Grovo,*
826 F.3d 1207 (9th Cir. 2016) .................................. 18

*United States v. Hernandez,*
876 F.2d 774 (9th Cir. 1989) .................................. 19

*United States v. Herrera-Gonzalez,*
263 F.3d 1092 (9th Cir. 2001) .................................. 17

*United States v. Hinkson,*
585 F.3d 1247 (9th Cir. 2009) .............................. 24, 30

*United States v. Infelise,*
765 F. Supp. 960 (N.D. Ill. 1991) .................................. 34

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Iriarte-Ortega,*
113 F.3d 1022 (9th Cir. 1997)................................................18

*United States v. Lennick,*
18 F.3d 814 (9th Cir. 1994)..................................................22

*United States v. Lewis,*
40 F.3d 1325 (1st Cir. 1994) ................................................25

*United States v. Lindsey,*
634 F.3d 541 (9th Cir. 2011) ................................................16

*United States v. Mendoza,*
25 F.4th 730 (9th Cir. 2022) ................................................21

*United States v. Mesa-Farias,*
53 F.3d 258 (9th Cir. 1995)..................................................20

*United States v. Moe,*
781 F.3d 1120 (9th Cir. 2015)...............................................17

*United States v. Navarrette-Aguilar,*
813 F.3d 785 (9th Cir. 2015)...........................................18, 19

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010)........................................14, 15, 16

*United States v. Olano,*
62 F.3d 1180 (9th Cir. 1995)................................................31

*United States v. Olano,*
507 U.S. 725 (1993) .........................................................30

*United States v. Rubio-Villareal,*
967 F.2d 294 (9th Cir. 1992)................................................14

*United States v. Shryock,*
342 F.3d 948 (9th Cir. 2003)................................................24

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Simtob,*
  485 F.3d 1058 (9th Cir. 2007)..................................................24

*Walker v. Martel,*
  709 F.3d 925 (9th Cir. 2013).............................................31, 32

*Wharton v. Chappell,*
  765 F.3d 953 (9th Cir. 2014)..................................................33

**Federal Statutes**

18 U.S.C. § 3231.........................................................................3

28 U.S.C. § 1291.........................................................................3

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................4

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

CHANEL WILEY,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 20-298-JAK*

## GOVERNMENT'S ANSWERING BRIEF

# I

# INTRODUCTION

Defendant Chanel Wiley had an agreement with her boyfriend, co-defendant Scott Penner, to distribute methamphetamine. An informant went to defendant's apartment and bought approximately an ounce of methamphetamine in a recorded transaction. That video recording—the government's primary evidence—showed that defendant initiated the transaction and benefitted from the drug sale because as partial

payment the informant reduced by $50 a debt defendant owed him. Further indicating a joint venture, defendant told the informant that she and Penner had tested the methamphetamine they had the prior week for fentanyl and found none, and she believed this was the same methamphetamine. The next day, the informant went to defendant's apartment and paid for the drugs.

A jury convicted defendant of conspiracy to distribute methamphetamine. Viewing the evidence in the light most favorable to the verdict, the video and other evidence at trial sufficiently established that defendant was a participant in the conspiracy and was not merely present.

The district court did not abuse its discretion in responding when defendant's electronic monitoring device beeped during jury selection. The court directed the government to communicate with Pretrial Services, they turned off the device, and the court had the bracelet removed outside the jury's presence. Defendant has offered no evidence that any juror saw the ankle monitor or was aware that the beeps came from defendant's monitor.

Defendant's conviction should be affirmed.

# II

## ISSUES PRESENTED

A.     Whether, viewed in the light most favorable to the government and drawing all reasonable inferences in support of the verdict, the evidence was sufficient to support defendant's conviction for conspiracy to distribute methamphetamine.

B.     Whether the district court abused its discretion in addressing an incident where defendant's electronic monitoring device alerted during jury selection.

# III

## STATEMENT OF THE CASE

### A.     Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This Court's jurisdiction rests on 28 U.S.C. § 1291.  The district court entered judgment on October 7, 2022.  (1-ER-2–3; CR 202.)[1]  Defendant

---

[1]  "AOB" refers to Appellant's Opening Brief and is followed by applicable page numbers.  "CR" refers to the Clerk's Record in the

(continued  . . . .)

filed a timely notice of appeal on October 19, 2022.  (2-ER-21.)  *See* Fed.

R. App. P. 4(b)(1)(A)(i).  Defendant is not in custody.

## B.  Statement of Facts and Procedural History

### 1.  *An informant buys methamphetamine from defendant and Penner*

During an investigation of co-defendant Penner, an informant told

the FBI that defendant was Penner's girlfriend and he could get more

information about Penner at defendant's home.  (3-ER-351–52, 380–81,

456, 463–64.)  The informant went to defendant's house wearing a

hidden recording device.  (3-ER-455, 463–64.)  As the visit that day was

to obtain information, the FBI did not provide the informant with any

money to purchase drugs.  (3-ER-331–32, 351, 372, 377, 380, 463.)

Defendant's home was a small apartment, approximately 400 square

feet, with a living room, a bedroom, a kitchen, and a bathroom.  (3-ER-

_____

district court and is followed by the docket number.  Exhibits 3-10 and
13 consist of video recordings that were admitted and played at trial;
citations to specific portions of these digital exhibits are made to
individual time stamps within the recordings as elapsed time; for
example, a citation to "00:00" corresponds to the beginning of the digital
file, and a citation to "01:00" corresponds to an event occurring one
minute into the digital file.  The government has filed an unopposed
motion to transmit these digital exhibits.

340, 342.)  The apartment had no internal doors, except a door to the bathroom.  (3-ER-342, 469.)

As captured by the video, defendant answered the informant's knock on the door and invited him in.  (Ex. 3; SER-9.)[2]  Penner was also inside, and shortly after the informant entered, the three started talking about a raid that had happened the night before —"a large number of officers serving search warrants at several different locations where illegal items are removed and people are arrested."  (Ex. 4 00:04-02:29; 3-ER-357; SER-10–13)

After discussing the raid, the informant told defendant and Penner, "I still can't find shit . . . I can't find nothing."  (Ex. 5 00:07-00:11; SER-14.)  Defendant asked the informant, "You need crap?" (methamphetamine).  (Ex 5 00:10-00:11; SER-14; 3-ER-464–65.)  The informant said he did, and defendant told the informant that she remembered that "I do still owe you $100."  (Ex 5 00:13-00:19; SER-14.)

_____

[2] SER-8–37 consists of transcriptions of audio captured in digital exhibits that were admitted at trial.  The transcriptions were not admitted as exhibits, but the government has included them in the SER for the Court's convenience.

The informant asked defendant if she could "take care of it for" him because he did not have any money on him.  (Ex. 5 00:26-00:30; SER-14.)  After this interaction, the informant asked, "spot me one 'till tomorrow?" and Penner said yes.  (Ex. 5 00:50-00:55; SER-15.)  That is, Penner agreed to front drugs to the informant and allow him to pay later.  (3-ER-451.)  The informant asked for the price and Penner responded "Alright, I'll give you two for one-fifty, and knock fifty bucks off her tab."  (Ex. 5 00:55-01:10; SER-15.)  The informant agreed, so $50 of the payment for the drugs would be made by reducing $50 of defendant's debt to the informant.  (3-ER-468.)  According to the informant, during these conversations, defendant was in and out of the kitchen, and was in the kitchen when the informant and Penner negotiated the price for the methamphetamine.  (3-ER-458, 462.)

The video shows Penner weighing out baggies of methamphetamine on a digital scale on a table in defendant's living room as the three discussed various topics.   (Ex 5. 01:36-01:58; Ex. 6.)  Penner handed the informant two baggies so that the informant could see which one was heavier.  (Ex. 6; SER-19.)

At one point, the three spoke about drugs containing fentanyl. (Ex. 7 01:50-02:16; SER-21–22.) The informant commented that for a while he had some fentanyl strips—used to test for the presence of fentanyl—and that it was there "every time." (Ex. 7 02:16-02:23; SER-22.) Defendant then said, "Yeah. That's funny you say that 'cause we came across some of those little fentanyl test strips and I tested the crap we had last week and it didn't have any in it." (Ex. 7 02:23-02:29; SER-22.) The informant expressed surprise, defendant confirmed, and Penner agreed "it was good, yeah." (Ex. 7 02:28-02:31; SER-22–23.) Defendant asked the informant to test the methamphetamine and let her know the result because "this is the same, I think it's the same shit." (Ex.7 02:33-03:02; SER-23.) Penner agreed. (Ex. 7 03:00-03:02; SER-23.) The three continued talking for a short time, and the informant then left with one of the baggies, which contained 27.3 grams of pure methamphetamine. (2-ER-273, 404–407.)

The following day, the FBI gave the informant money to pay for the fronted methamphetamine. (3-ER-308–09.) Again, the informant, wearing a recording device, went to defendant's home. (3-ER-309–10.)

The recording device captured the informant knocking on defendant's door, defendant answering, and defendant letting him inside. The informant told defendant that had tried "calling him" (Penner), but he hadn't answered. (Ex. 13; SER-35.) Defendant told the informant that Penner had lost his phone and was out looking for it. (*Id.*) The informant asked defendant, "Can I leave this, something that I owe?" (*Id.*) She replied, "Oh yeah, yeah, that's fine" and then asked him "and you're good?" (Ex. 13; SER-36.) The informant gave defendant $150, and although the video does not show the exchange, the informant testified that he left the money on a table inside the apartment. (3-ER-460–61.) The informant was at defendant's apartment for less than a minute and a half, and as he left she said "gracias senor." (Ex. 13; SER-36.)

Defendant and Penner were charged with (1) conspiracy to distribute methamphetamine; and (2) distribution of methamphetamine. (2-ER-17–20.) Penner pleaded guilty, and defendant proceeded to trial. (CR 108, 168.)

## 2. *Defendant's ankle monitor beeps during jury selection*

Defendant was initially released on bond without electronic monitoring. (CR 22.) However, after violating bond conditions, the court ordered defendant detained pending trial and set a self-surrender date. (CR 66.) After defendant failed to self-surrender by the required date, she was arrested on a bench warrant and again ordered detained. (CR 73, 76.) In June 2021, a magistrate judge granted defendant's motion to be released on bond pending trial, but admonished defendant:

> [M]y responsibility is to make sure you show up for court, okay. And based on what happened last year, I have real doubts about that. And when Judge Kronstadt issued a warrant and said, "Get in here and talk to me and deal with this," we couldn't find you for a while, and that's a real problem."

(SER-4.) This time, in light of the circumstances that led to her detention, the court ordered defendant to wear an electronic ankle monitor to ensure she would appear for court. (SER-6–7; CR 90.)

On the first day of trial, a few minutes before jury selection began, defense counsel advised the court that defendant "is on an electronic monitoring device which keeps giving out audible alerts, and we're afraid that would be prejudicial to the jury." (2-ER-75.) Counsel asked

the court if it had "heard the one that just occurred," to which the court responded, "I did.  Can the device be muted?"  (*Id.*)  The case agent offered to communicate with the Marshal's Service "to see if they can mute it for her."  (*Id.*)  The court replied, "I believe it can only be removed by Pretrial [Services].  Let's work on that please."  (*Id.*)  The court proceeded to jury selection.  Defendant did not object, propose a different course of action, or request that the ankle monitor be removed immediately.

Approximately an hour into jury selection, defendant asked for a side bar and advised the court that defendant's "ankle monitor keeps alerting" and that counsel believed that "every juror on this side is hearing it and seeing I have to fiddle with it."  (1-ER-14; 2-ER-120.)  The court disagreed, stating that while it had also heard the alerts, the court did not "think anyone really knows what that sound is."  (*Id.*)

At that point, the FBI agent reported back about his conversation with Pretrial Services:

> Your Honor, there's two options.  I spoke with Pretrial Services.  They indicated that the battery is at 10 percent because [defendant] failed to charge it correctly.  They said

that they manually turned the device off at their main station, and it should no longer make an audible noise.

They did authorize, I can cut the device off if they want. But they said they deactivated it. So based upon that, I'm surprised it's still making any noise. But we can cut it off, Your Honor.

(*Id.*)

The district court resolved the issue as follows:

All right. Let's do the following. I will have you cut it off. But to do that, we obviously have to send everybody out. So if it alerts again, then I'll—I'll have a recess. If it doesn't, then we'll just leave it alone for now and then remove it.

(1-ER-14–15; 2-ER-120–21.) Defense counsel said "Thank you" and did not request an immediate recess.

A few minutes later, a prospective juror told the court that he could not hear the court. (2-ER-123.) The court told the prospective jurors that the court would take a "short break" to "address this technical issue." (*Id.*) During that recess, out of the presence of the prospective jurors, the agent removed the electronic monitoring device from defendant and took it out of the courtroom. (2-ER-124–25.)

### 3. *Trial, conviction, and sentencing*

After the government rested, the district court asked the defense if they would be making a motion, but defendant did not make a Rule 29 motion for acquittal.  (3-ER-452–53.)  After the close of the defense case, the defense again did not make such motion.  (3-ER-484–85.)

The jury found defendant guilty on the conspiracy count, and not guilty of distribution of methamphetamine.  (3-ER-558.)

The district court sentenced defendant to a far-below-Guidelines sentence of 16 months (the Guidelines range was 57–71 months), followed by four years of supervised release.  (CR 196; ER-2.)  Defendant has completed her custodial sentence.

## IV

## SUMMARY OF ARGUMENT

1.    The evidence admitted at trial, viewed in the light most favorable to the government, firmly supported defendant's conviction for conspiracy to distribute methamphetamine.  The evidence demonstrated that defendant was more than merely present for a methamphetamine sale to an FBI confidential informant—she hosted

the transaction, initiated it, received payment for it, and benefitted from it. A rational juror could also infer from defendant's and Penner's statements that they had tested the previous week's methamphetamine supply for fentanyl and that the methamphetamine the informant was buying was "the same shit" that defendant and Penner had an ongoing agreement to sell. Defendant's arguments for acquittal simply offer innocent explanations for her actions, urge the Court to accept them over culpable ones, and interpret the evidence in her favor, which is precisely what the law forbids. Viewing the evidence in favor of the government and drawing all reasonable inferences in support of the verdict, any rational juror could have found that defendant conspired with Penner to sell methamphetamine.

2. The court did not abuse its discretion in its handling of defendant's ankle monitor that alerted during jury selection. The court directed the government to confer with Pretrial Services about the problem, Pretrial Services turned off the device, and the court had the monitor removed outside the jury's presence. Nor was there a due process violation here. Although the Supreme Court has held that

using visible physical restraints at trial may violate due process, that analysis does not apply here. The electronic ankle monitor was not visible and is not inherently prejudicial like shackling. Thus, defendant must demonstrate actual prejudice, and she cannot do so. There is no evidence that any juror heard the beeping sound or knew its source, defendant wore the device only for one hour of jury selection, and the jury acquitted defendant on the substantive distribution count, demonstrating that they were able to analyze the evidence fairly.

# V

## ARGUMENT

## A. The Evidence At Trial Was Not Plainly Insufficient

### 1. *Standard of review*

Review of the sufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), and "is highly deferential." *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc). A two-step inquiry is prescribed. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, this Court "must consider the evidence presented at trial in the light most favorable to the prosecution." *Id.* "This means that [the Court] may not usurp the role of the finder of fact

14

by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id.* Rather, "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal quotation marks omitted). The Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326).

Second, this Court must determine whether the evidence, so viewed, "is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). At this second step, the Court "may not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, only whether any rational trier of fact could have made that finding." *Id.* (cleaned up).

Consistent with this standard, it is well established that circumstantial evidence and inferences drawn from it are sufficient to sustain a conviction, *United States v. Bennett*, 621 F.3d 1131, 1139 (9th Cir. 2010), provided that the underlying inferences are "supported by a chain of logic," *United States v. Begay*, 673 F.3d 1038, 1045 (9th Cir. 2011) (en banc). Such a "chain of logic" is "all that is required to distinguish reasonable inference[s] from speculation." *Id*. The government does not "need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence," or rule out every hypothesis other than guilt. *Nevils*, 598 F.3d at 1164; *accord United States v. Lindsey*, 634 F.3d 541, 552–54 (9th Cir. 2011). "The mere fact that evidence submitted by the government is wholly susceptible to innocent explanations is not enough to reverse a conviction on appeal." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1145 (9th Cir. 2012) (cleaned up).

Where, as here, a sufficiency-of-the-evidence claim was not raised before the district court, a defendant must demonstrate plain error. *United States v. Benamor*, 937 F.3d 1182, 1188 (9th Cir. 2019). Plain

error requires (1) error that (2) was clear or obvious, (3) affected defendant's substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

### 2. *A rational juror could find that defendant was a participant in the conspiracy and was not merely associating with Penner*

This Court has observed that in the context of sufficiency-of-the-evidence claims, the plain error standard is only theoretically more stringent because the standard ordinarily applied to sufficiency-of-the-evidence challenges is already so stringent. *United States v. Cruz*, 554 F.3d 840, 844 (9th Cir. 2009). Here, "[defendant's] conspiracy conviction is not a manifest injustice." *United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998).

"The elements of conspiracy are '(1) an agreement to accomplish an illegal objective, and (2) the intent to commit the underlying offense.'" *United States v. Moe*, 781 F.3d 1120, 1124 (9th Cir. 2015) (quoting *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)). To establish a criminal conspiracy, the government is not

required to prove that an express agreement existed. "[R]ather, agreement may be inferred from conduct." *United States v. Navarrette-Aguilar*, 813 F.3d 785, 794 (9th Cir. 2015); *see also United States v. Duenas*, 691 F.3d 1070, 1085 (9th Cir. 2012) ("The government need not prove an express or formal agreement; instead, agreement may be inferred from conduct." (internal quotation marks omitted)). Conspiracies operate clandestinely, which is why "the prosecution is seldom able to present direct evidence of the agreement." *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024, *amended*, 127 F.3d 1200 (9th Cir. 1997). Therefore, a conspiratorial agreement may be shown based on "circumstantial evidence that defendants acted together in pursuit of a common illegal goal." *Navarrette-Aguilar*, 813 F.3d at 794. Where conspirators act in a coordinated fashion, "the likelihood that their actions were driven by an agreement increases." *Iriarte-Ortega*, 113 F.3d at 1024; *United States v. Grovo*, 826 F.3d 1207, 1216 (9th Cir. 2016) ("Coordination between conspirators, for example, is strong circumstantial proof of agreement." (internal quotation marks omitted)).

Here, the government presented sufficient evidence that defendant entered into an agreement with Penner to distribute methamphetamine. Considering defendant's actions and words, and those of Penner, a rational juror could infer that they were both acting together "in pursuit of a common illegal goal," and that defendant was not merely associating with Penner. *Navarrette-Aguilar*, 813 F.3d at 794.

Defendant was not merely present. She not only hosted the drug sale (it took place in her apartment), she initiated the drug transaction. Shortly after the informant came to her house, seemingly unannounced, and said that he couldn't find "shit," defendant asked him, "you need crap?" (Ex. 5 00:10-00:11; SER-14; 3-ER-465.) A reasonable juror could infer that her question was an offer to sell methamphetamine. Indeed, immediately afterwards, Penner began discussing pricing with the informant and weighing baggies of methamphetamine. (Ex. 5 01:10-01:58; SER-15.) *See United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir. 1989) (holding that "the coordinated actions of the codefendants [is] strong circumstantial evidence of an agreement" and "[t]he likelihood

that these actions were not driven by an agreement [was] extremely remote."); *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995) ("An agreement between Mesa-Faris and Mendoza was shown by their coordinated activities.")

Defendant's statements to the informant about fentanyl-tainted methamphetamine also demonstrate that she and Penner acted together in pursuing their illegal goal of distributing methamphetamine. Defendant explained to the informant that she tested the methamphetamine "we"—Penner and defendant—"had last week," it did not have fentanyl, and the methamphetamine the informant had just purchase was "the same shit." (Ex. 7 2:23-3:02; SER-22–23.) Penner confirmed that the previously-tested methamphetamine "was good." (Ex. 7 02:28-02:31; SER-22– 23.) A rational juror could reasonably infer based on the information about the prior week's methamphetamine supply that defendant and Penner had an ongoing relationship selling methamphetamine, and that the transaction with the informant was part of that larger course of sales.

Additionally, defendant stood to gain from the sale. As the informant testified at trial, and the video showed, part of the payment for the methamphetamine was a reduction of defendant's debt to the informant. (Ex. 5 00:55-01:10; SER-15; 3-ER-48.) Defendant argues that she was not in the living room when Penner and the informant negotiated the price for the methamphetamine—implying that she did not know about it. (AOB 5.) A jury could have reasonably concluded that she heard the negotiation, however, as the informant testified that she was in and out of the kitchen in a 400 square-foot apartment with only one internal door to a bathroom. But the jury did not have to find that fact to infer that defendant had an agreement with Penner to sell methamphetamine. That Penner negotiated the sale to benefit defendant financially is consistent with an ongoing agreement between the two to sell methamphetamine and defendant's "shared stake in" that joint drug operation. *See United States v. Mendoza*, 25 F.4th 730, 738 (9th Cir. 2022).

Last, defendant accepted the rest of the payment from the informant. Defendant stresses that when the informant dropped off

money at her home, "he did not tell [her] what it was for." (AOB 11.)
He did not need to. The jury could reasonably conclude that she already
knew—because she heard the negotiations or because she learned from
Penner. After all, defendant did not ask the informant what the money
was for, but instead asked him if he was "good" and thanked him before
he left. (Ex. 13; SER-36 ("Gracias senor.").)

United States v. Lennick, 18 F.3d 814 (9th Cir. 1994), does not
help defendant. Lennick's concern is that not every narcotics sale
constitutes a distribution conspiracy between the buyer and seller; in
that scenario there must be an agreement for further distribution. Id.
at 819. Here the conspiracy is between two sellers, not a buyer and a
seller. When two sellers jointly engage in a sale as part of an ongoing
joint venture, a rational jury can infer agreement between them to
distribute the drugs.

Defendant's remaining arguments essentially ask this Court to
usurp the role of the jury and accept her interpretation of the evidence,
contrary to Jackson. That defendant was not the target of the FBI's
investigation does not speak to whether or not she was in a conspiracy

with Penner.  (AOB 11.)  It is not unusual, and happens, as a government witness testified, that an investigation into one target leads to the discovery of other criminals.  (3-ER-330.)  Defendant did not have to package or weigh the methamphetamine in order to conspire with Penner to distribute it.  (AOB 11.)  "Although mere proximity to the scene of illegal drug transactions is not sufficient to establish involvement in the illicit activity, a defendant's presence may support such an inference when viewed in context with other evidence."  *Garcia-Guizar*, 160 F.3d at 517 (internal quotations omitted).  Here, the location of the unplanned transaction in defendant's apartment, defendant's presence during the transaction, her initiation of it, her statements about additional methamphetamine that she and Penner possessed the previous week, and her financial stake in the transaction all support an inference that defendant conspired with Penner to distribute methamphetamine.

This Court should affirm defendant's conspiracy conviction.

**B.** **The District Court Did Not Plainly Err or Abuse Its Discretion In Addressing The Issue of Defendant's Electronic Monitoring Device Beeping During Jury Selection**

### 1. *Standard of review*

Defendant analogizes this case to shackling and maintains that the standard of review is abuse of discretion. (AOB 13.) The government disagrees that the shackling analogy is appropriate, *see infra*, but agrees that abuse of discretion is generally the appropriate standard for the type of incident that occurred here. *See United States v. Shryock*, 342 F.3d 948, 974 (9th Cir. 2003) (courtroom security measures reviewed for abuse of discretion); *United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007) (a trial court's decision regarding jury incidents is reviewed for abuse of discretion).

Abuse of discretion review is deferential. The ruling below must be affirmed so long as the district court (1) "identified and applied the correct legal rule," and (2) made factual findings that were not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

Here, however, plain error review is appropriate. Defendant advised the court of the audible beeping, but she did not ask the court to take any action or object to the court's proposed solutions. *See United States v. Lewis,* 40 F.3d 1325, 1338 (1st Cir. 1994) (applying plain error review where defendant "merely raised some vague concerns in a sidebar conference").

### 2.    *Legal framework*

Due process "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). This constitutional rule is based on "three fundamental legal principles." *Id.* at 630. First, "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process" by "suggest[ing] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). Second, shackles can interfere with the defendant's ability to communicate with his lawyer,

thus implicating the right to counsel. *Id.* at 631. Third, the "routine use of shackles in the presence of juries . . . affronts the dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* (cleaned up).

*Deck* concerned visible restraints at trial. *See Bernal v. Woodford*, 281 F. App'x 706, 707 (9th Cir. 2008) (distinguishing *Deck* where restraints were not visible at trial). Applying that limitation, courts have declined to apply *Deck*'s due process analysis to ankle electronic monitors and stun belts. Two Circuits have held that *Deck* does not apply to security devices such as stun belts that are worn under clothing and not visible to the jury. *Nance v. Warden, Georgia Diagnostic Prison*, 922 F.3d 1298, 1305 (11th Cir. 2019) (holding that the shackling analysis is not applicable to security devices or measures that are not visible); *United States v. Busch*, 411 F. App'x 872, 876 (6th Cir. 2011) (distinguishing *Deck* where trial judge found there was no evidence the jury was aware of the stun belt attached to defendant's leg).

More broadly, *Deck* involved leg irons, handcuffs, and a belly chain. 544 U.S. at 625. Such shackling is "inherently prejudicial," unlike the electronic monitoring device here. *See Holbrook*, 475 U.S. at 568–69 (conspicuous deployment of security personnel in a courtroom during trial was not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest"); *see also Higgins v. Addison*, 395 F. App'x 516, 519 (10th Cir. 2010) ("Even assuming the ankle monitor was worn during trial and was visible to the jury, [the defendant] has not identified any Supreme Court holding expressly extending the general prohibition on restraining a criminal defendant with visible shackles to the factual situation presented here."). In *White v. United States*, the defendant, like defendant here, contended "he suffered prejudice because he wore a tether that went off during trial with the jury present." No. CR 13-20423, 2023 WL 2668431, at *8 (E.D. Mich. 2023), *appeal filed* (6th Cir. May 18, 2023). The court found the shackling analysis in *Deck* inapplicable because (1) there was nothing in the record to suggest that the jury understood the defendant was wearing the tether, and (2)

27

*Deck*'s reasoning did not apply. *Id.* *White* explained that unlike shackles, the use of an ankle electronic monitoring device does not suggest to the jury that the "justice system itself sees a need to separate a defendant from the community at large," it does not interfere with the defendant's ability to communicate with his lawyer, and it does not undermine the court's ability to "maintain a judicial process that is a dignified process." *Id.* (quoting *Deck*, 544 U.S. at 630–31).

For the reasons set forth in *Bernal*, *Nance*, *Busch*, and *White*, *Deck*'s due process analysis does not apply here. The electronic monitoring device defendant wore was different from the type of visible restraints addressed in *Deck*, and the court found that the jurors did not know what the alarm was.

### 3. *The district court acted within its discretion*

Under the abuse of discretion standard, this Court "must affirm unless it is left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors." *United States v. Christensen*, 828 F.3d 763, 806 (9th Cir. 2015). There was no abuse of discretion here.

Defense counsel raised the issue of defendant's ankle monitor for the first time a few minutes before jury selection began. (2-ER-75.) The court promptly directed the government to contact Pretrial Services to mute or remove the device. It was not an abuse of discretion to proceed with jury selection, as defendant made no request for a delay (or proposed any other action), and, as the court later found, there was nothing to suggest the jury knew what the beeping sound was even if they heard it.

When defendant raised the issue again an hour later, the FBI agent reported that he had spoken to Pretrial Services and had permission to cut off defendant's ankle monitor. The court stated that it would have the agent cut it off, and the agent did so a few minutes later when the court excused the jury for a brief recess to fix a problem with the sound system in the courtroom. (2-ER-123–125.) The court was also careful to ensure that the jury did not see the device when the agent removed it from the courtroom. (2-ER-124–25.) Again, defense counsel did not object to this resolution or seek alternative relief.

In sum, the court acted reasonably and expeditiously to disable and remove the electronic monitor and ensure that there was no prejudice to defendant.

### 4.     *Defendant has not shown prejudice*

On plain error review, defendant bears the burden of showing prejudice—that is, that any error affected the outcome of the trial. *United States v. Olano*, 507 U.S. 725, 734 (1993) trial.[3]  She cannot do so.

First, defendant does not claim that any juror saw the ankle bracelet or that it interfered with her ability to communicate with her lawyer.

Second, the court's finding that jurors would not recognize the sound as an ankle monitor was not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1263.  Even if a prospective juror had heard the sound of defendant's ankle monitor, they may well have thought it was

---

[3] Even if this Court applies abuse of discretion review, defendant was not prejudiced.

someone's cellular phone, the courtroom's malfunctioning sound equipment, a medical device, or the courtroom security's radios, among other possibilities. The jurors were not examined and there is no testimony or other evidence that any juror heard the beeping or recognized its source. *See United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995) (defendant failed to show prejudice where he did not examine the jury and adduced no other evidence of prejudice).

Third, even if the ankle monitor is considered a restraint—and the government submits it should not be—"not all restraints are created equal." *Walker v. Martel*, 709 F.3d 925, 942 (9th Cir. 2013). In *Walker*, in concluding that the defendant was not prejudiced by his counsel's failure to object to a knee restraint placed under his clothing, this Court observed that the knee restraint "was significantly less obtrusive and restrictive than the kinds of shackles that the Supreme Court considered" in *Deck* and did not suggest "a proclivity for violence." *Id.* The same is true of the device here. An ankle monitor at most implies a concern about the possibility that a defendant might flee. But that does

not suggest that such a defendant would be dangerous or more or less likely to have conspired to distribute methamphetamine.

Fourth, the defendant wore the electronic monitor only for an hour of jury selection before it was removed. Even assuming, contrary to the record evidence, that any juror heard the beeping and associated it with an electronic monitor, the brief period that the monitor was present would "not be interpreted as a sign that [defendant was] particularly dangerous or culpable." *Holbrook*, 475 U.S. at 569; *see also Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (where defendant wore leg brace for only first two days of six-day trial, the "jury would likely have interpreted the judge's decision to remove the leg brace . . .as evidence that Larson was not a dangerous individual").

Finally, the jury acquitted defendant on the substantive count, "demonstrating that the jury was able to analyze the evidence fairly and was not blinded by the [electronic monitor] on [defendant's] leg." *Walker*, 709 F.3d at 943.

### 5. *There was no constitutional violation*

Because, as discussed *supra*, the electronic monitoring device used here was not inherently prejudicial like shackling at trial, the alerts from defendant's electronic monitor during the first hour of jury selection violated due process only if defendant can show actual prejudice. *Holbrook*, 475 U.S. at 572; *Wharton v. Chappell*, 765 F.3d 953, 964 (9th Cir. 2014) (because jurors' view of a defendant shackled outside the courtroom while being transported is not inherently prejudicial, "a due process violation occurs only if the criminal defendant demonstrates actual prejudice"). As set forth in the preceding section, she cannot.

Defendant argues that her claim should be evaluated under the test that applies to visible shackling at trial. (AOB 18.) For the reasons set forth in section V.B.2 *supra*, that is not the proper test. In any event, she cannot satisfy any factor of that test. In order to demonstrate that shackling amounts to a constitutional violation, defendant must show that: (1) she was physically restrained in the presence of the jury; (2) the shackling was seen by the jury; (3) the

physical restraint was not justified by state interests; and (4) she

suffered prejudice as a result. *Cox v. Ayers*, 613 F.3d 883, 890 (9th Cir.

2010).

First, defendant was never physically restrained. The nature of

an ankle monitor, as opposed to shackles, is that it notifies Pretrial

Services of the wearer's movements, but does not physically obstruct

their movement. Once Pretrial Services learns from an ankle monitor

that a defendant enters an unpermitted location, they can then contact

the defendant. (SER-6–7) In that way, it is no more a "physical

restraint" than the bond conditions themselves. *See United States v.

Infelise*, 765 F. Supp. 960, 963 (N.D. Ill. 1991) (describing ankle

bracelets as "reactive systems" that "don't prevent anybody from doing

anything," but only "give [courts] notice when something has

happened"). Second, there is no evidence in the record that any

prospective juror saw the ankle monitor. Nor is there direct evidence

that any prospective juror heard it—only that the judge and defense

counsel heard the alerts. Even if any prospective jurors may have

heard the sound, there is no evidence they knew its source.

Third, the ankle monitor was justified by the state interest of ensuring that defendant attend each and every day of the trial. Defendant's bond conditions were modified to include electronic monitoring because she failed to obey court orders and after she failed to self-surrender for pretrial detention.

Fourth, defendant cannot meet her burden of showing that she suffered prejudice for all the reasons set forth in section V.B.4 *supra*.

# VI

# CONCLUSION

Defendant's conviction should be affirmed.

DATED: August 11, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*/s/ Elia Herrera*

ELIA HERRERA
DAVID Y. PI
Assistant United States Attorneys

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 6,144 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.


DATED: August 11, 2023          */s/ Elia Herrera*

ELIA HERRERA
DAVID Y. PI
Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA